JULIA RHINELANDER DODGE et al., Appellants, *v.* MARY L. GALLATIN et al., Respondents.

Under the law, as it existed in this state prior to the revision of 1830, a testator could only devise such lands as he was seized and possessed of at the time of the making and publishing of his will, save where he was at that time in possession under equities, which the court would enforce, in which case such rights and equities would pass under a devise.

In February, 1807, R. made and published his will by which he devised all his residuary real estate of which he was then or might be seized and possessed of at the time of his death to C. At that time R. was the owner of certain lands in the city of New York, bounded easterly by the high-water mark of the Hudson river; he subsequently petitioned the common council for a grant of land under water in front of his uplands. Such a grant was executed and delivered in November, 1807. R. died in 1809 without republishing his will. In an action of ejectment brought to recover two lots, part of the lands covered by said grant, in which action defendants claimed title under said will, it appeared that in 1794 the board of aldermen of said city passed a resolution to grant the then owner of said uplands the water lots in front thereof. In 1797 the then owner petitioned said board for a grant so that he might build a bulkhead and fill in his water lots; this was referred to a committee, who reported in favor of a grant, which report was agreed to by the board. It did not appear that any conveyance was executed; but it appeared that the petitioner, prior to 1799, took possession, docked out and filled in the lots and had the use of the property from that time. In 1798 the city presented a petition to the legislature setting forth, among other things, that it had lately directed a permanent street to be laid out at the extremity of its grants "already made and thereafter to be made" on said river, and asking authority to compel the proprietors of the lots fronting thereon to make the street. Thereupon an act was passed (Chap 80, Laws of 1798), authorizing the city to lay out the street at the expense of the adjoining proprietors and requiring the proprietors of the uplands, who had not acquired title to the land under water, to fill up the space between their lots and said street. The act provided that upon their doing this they shall "be respectively entitled to become the owners of the said intervening space of ground in fee simple." The city accepted the act, and, in pursuance thereof, the then owner of the upland adjoining the land conveyed by said grant, filled in the space between his uplands and said street. *Held*, that these facts disclosed an equitable title in R. at the time of the execution of his will, which passed by the devise.

*It seems* a controversy as to the amount due upon a contract for the purchase of real estate would not prevent its passing by devise in the will of the purchaser executed prior to 1880; subject, however, to the amount that should be found due.

M., one of the heirs of R. and under whom plaintiffs claimed, was at the time of his death and at the time of her death, which occurred in 1852, a married woman. She died leaving two children, both of age. Her husband died in February, 1854. From 1823 to the death of M. the premises were held adversely to her by those under whom defendants claim. *Held,* that action should have been brought within ten years after the death of the husband, and not having been brought within that period was barred by the Statute of Limitations. (Code Pro. § 88.)

Exceptions were taken to the admission in evidence of petitions to the common council for the grant and of certain old maps and leases. It appeared that upon the death in 1825 of the then owner of the uplands he left a large landed estate, which for upwards of fifty years was under the management and control of his executor, who had an office as executor, and in a safe therein, kept the books and papers of the estate, including a large number of old deeds, leases and muniments of title, and among these the petitions, maps and leases were found. The fact that petitions by the parties were presented to the board of aldermen at the dates indicated appeared by a record of its proceedings. A careful examination, however, failed to find the petitions on file. *Held,* that the papers were properly received as ancient writings, and the petitions as being the best evidence obtainable of the petitions presented to the board of aldermen.

Reported below, 52 Hun, 158.

(Argued October 5, 1891; decided December 1, 1891.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department entered upon an order made April 9, 1889, which affirmed a judgment in favor of plaintiffs entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Daniel Dougherty* for appellants. Under the law as it existed in 1807, when Wm. Rhinelander, Jr., published his will, land acquired subsequently to the date of the publication of a will did not pass thereby, but vested in the heir at law. (*Lynes* v. *Townsend,* 33 N. Y. 561; *Jackson* v. *Holloway,* 7 Johns. 81; *Jackson* v. *Potter,* 9 id. 312.) Neither Wm.

Rhinelander, Jr., nor his father before him had any right whatever to grants on account of the ownership of the upland. (*Mayor, etc., v. Hart,* 95 N. Y. 443; *Appleby* v. *Mayor, etc.,* 41 Hun, 281; 4 N. Y. S. R. 496; *Furman* v. *Mayor, etc.,* 6 Seld. 567; *Gould* v. *H. R. R. R. Co.,* 2 id. 522; *Towle* v. *Remsen,* 70 N. Y. 303; *Langdon* v. *Mayor, etc.,* 93 id. 134; *Nott* v. *Thayer,* 2 Bosw. 25; *Wendell* v. *People,* 8 Wend. 188; *Comrs.* v. *Kimpshall,* 26 id. 410.) In order to sustain the defense of equitable title, which is the main defense herein, it must appear that Wm. Rhinelander, Jr., actually owned the land in question at the time he made his will, and before he applied for or acquired the grant, and was then entitled to a grant from the city confirmatory of his title, without the performance of any conditions, and that the grant, when subsequently acquired was in confirmation of his actual ownership. (*Lynes* v. *Townsend,* 33 N. Y. 563; *Jackson* v. *Holloway,* 7 Johns. 394; *Jackson* v. *Potter,* 9 id. 312; *McKinnon* v. *Thompson,* 3 Johns. Ch. 307; *Stevens* v. *Hauser,* 39 N. Y. 302; *Denn* v. *Miller,* 5 D. & E. 558; *Thompson* v. *Burhans,* 61 N. Y. 52; *Van Kleeck* v. *Dutch Reformed Church,* 6 Paige, 600; *Carleton* v. *Darcy,* 90 N. Y. 566–573; *Haxtun* v. *Corse,* 2 Barb. Ch. 506; *Dunham* v. *Townshend,* 118 N. Y. 281.) No rights to the land were acquired by Frederick Rhinelander. (*Appleby* v. *Mayor, etc.,* 4 N. Y. S. R. 96; 41 Hun, 281; *Mayor, etc.,* v. *Hart,* 95 N. Y. 443.) The referee erred in admitting the petition of Philip Rhinelander to the common council, dated May 10, 1797, after plaintiff's objection. (*Mayer* v. *Osborn,* 32 N. Y. 669; *Hammond* v. *Varian,* 54 id. 398; *Jackson* v. *Luquere,* 5 Cow. 221; *Utica Ins. Co.* v. *Badger,* 3 Wend. 102; *Wilson* v. *Betts,* 4 Den. 201; *Martin* v. *Rector,* 24 Hun, 27; *Pollock* v. *Pollock,* 71 N. Y. 137; *Draper* v. *Stouvenel,* 38 id. 219; *Mason* v. *Lord,* 40 id. 476; *Sickles* v. *Flanagan,* 79 id. 224; *Putman* v. *Hubbell,* 42 id. 106; *Stilwell* v. *M. L. Ins. Co.,* 72 id. 385; *Davis* v. *Spencer,* 24 id. 386; *Westerlo* v. *De Witt,* 36 id. 335; *Halpin* v. *P. Ins. Co.,* 28 N. Y. S. R. 788; 118 N. Y. 165.) There was no adverse possession of the premises. (*Brandt* v. *Ogden,* 1

Johns. 156; *Jackson* v. *Parker*, 3 Johns. Cas. 124; *Jackson* v. *Birner*, 48 Ill. 130; Starkie on Ev. 473; *Clark* v. *Owens*, 18 N. Y. 434, 439; *Jackson* v. *Johnson*, 5 Cow. 74; *La Frombois* v. *Jackson*, 8 id. 609, 613, 617; *Jackson* v. *Woodruff*, 1 id. 286; *Enfield* v. *Day*, 7 N. H. 457; *Hale* v. *Glidden*, 10 id. 397; *Zeller* v. *Eckert*, 4 How. [U. S.] 289; *Paschall* v. *Hinderer*, 28 Ohio St. 568; *Atty.-Gen.* v. *Fishmongers' Co.*, 5 M. & C. 16, 17; Perry on Trusts [2d ed.] §§ 863, 864, 866; *Thompson* v. *Pioche*, 44 Cal. 508; 1 Redf. on Wills, 502; *Schmittler* v. *Simon*, 101 N. Y. 558; *Pinney* v. *Johnson*, 8 Wend. 500; *D., L. & W. R. R. Co.* v. *Gilbert*, 44 Hun, 201; *Jackson* v. *Hathaway*, 15 Johns. 454; *Pope* v. *Hanner*, 77 N. Y. 240; *Wetmore* v. *Porter*, 92 id. 78; *Lee* v. *Horton*, 104 id. 538; *Stone* v. *Godfrey*, 5 De G., M. & G. 76; *Miller* v. *Downing*, 54 N. Y. 631; *Hallas* v. *Bell*, 53 id. 247.)

*Henry H. Anderson* for respondents. The premises in suit passed by the will of William Rhinelander, Jr., to his uncle, Philip Rhinelander, under whom the defendant Gallatin claims title. (*Livingston* v. *Newkirk*, 3 Johns. Ch. 312; *McKinnon* v. *Thompson*, Id. 307; *Malin* v. *Malin*, 1 Wend. 626; *Warren* v. *Fenn*, 28 Barb. 333; *Terrett* v. *Cowenhoven*, 11 Hun, 320.) The rights of the plaintiffs, if they ever had any, are barred by the Statute of Limitations. (Laws of 1801, chap. 183; 2 R. S. [2d ed.] chap. 4, §§ 5–17; Laws of 1870, chap. 741; *Carpenter* v. *Schermerhorn*, 2 Barb. Ch. 314; *Jackson* v. *Moore*, 13 Johns. 513; *Jackson* v. *Johnson*, 5 Cow. 74; *Thorp* v. *Raymond*, 16 How. [U. S.] 248; *Doe* v. *Jesson*, 6 East, 80; 2 Preston on Abs. 341; *Fleming* v. *Griswold*, 3 Hill, 85; Tyler on Eject. 930, 931.) William Rhinelander was not trustee for Maria Paulding of the premises in suit. (Code Civ. Pro. § 829.) The ancient leases by the Rhinelanders and the applications by them to the common council were properly admitted in evidence. (1 Phillips on Ev. 281; *Clarkson* v. *Woodhouse*, 5 T. R. 413; 3 Doug. 189; *Barnes* v. *Mawson*, 1 M. & S. 78; *Teathes* v. *Newitt*, 4 Price,

355; 8 id. 562; *Fisher* v. *Graves*, 3 E. & Y. 1180; *Hewlett* v. *Cock*, 7 Wend. 371; *Enders* v. *Sternberg*, 2 Abb. Ct. App. Dec. 31.)

HAIGHT, J. This action is brought in ejectment to recover the possession of two lots of land known as numbers 229 and 230 West street, between Beach and North Moore streets, in the city of New York.

The plaintiffs claimed the same as the heirs at law of William Rhinelander, Jr. The defendant Gallatin claims title through his last will and testament, and that she and her immediate grantors have held adversely for upwards of twenty years. The other defendants are merely tenants of Mrs. Gallatin.

It appears that William Rhinelander, the first, died in the year 1777; that he left surviving him three sons and three daughters; that the names of his sons were William Rhinelander, Phillip Rhinelander and Frederick Rhinelander. Frederick Rhinelander died intestate in the year 1805, leaving him surviving his widow, Mary; his son, William Rhinelander, Jr., and his daughter, Maria, who became the wife of William Paulding. It appears that at the time of his death, he was the owner of several parcels of real estate located upon Greenwich street, between Chambers and Beach streets, in the city of New York, and that subsequently his widow released her right of dower therein to her children, and thereafter and on the 18th of December, 1806, Maria, then the wife of William Paulding, in consideration of the sum of one hundred and twenty-four thousand dollars, conveyed to her brother, William Rhinelander, Jr., all the real and personal estate wheresoever and whatsoever whereof her father, Frederick Rhinelander, died seized or possessed, or was entitled to either in law or equity, in possession, reversion or remainder. It further appears that on the 3d day of February, 1807, William Rhinelander, Jr., made and published his last will and testament, in which, after devising specific property to his sister, Mrs. Paulding, and other persons, not affecting the premises in question, provided and devised as follows: "Sixth.

As to all the rest and residue of my property and estate whatsoever and wheresoever, real or personal, of which I am now seized or possessed, *or of which I may be seized or possessed at the time of my death,* I give, devise and bequeath the same to my uncle Philip Rhinelander and to his heirs and assigns forever; provided always and the above devise is upon the express condition that if my said uncle Philip Rhinelander should die without leaving issue at the time of his death and without devising in due form of law the estate hereby devised to him, then it is my will that the said estate, or such parts thereof as shall not be devised in due form of law, shall go, and I do hereby devise the same to my uncle William Rhinelander, his heirs and assigns forever." As the heir at law of his father and grantee of his sister, William Rhinelander, Jr., had become seized and possessed of the real estate upon Greenwich street, between Beach and North Moore streets, extending to the high-water mark of the Hudson river. As such owner, on or about the 1st day of June, 1807, he petitioned the common council of the city of New York to deliver to him a grant of the lands under water in front of his uplands out to the permanent line in the river established by the corporation. The application was agreed to by the board of aldermen, and a grant was ordered to be prepared, and the same was subsequently and on the 16th day of November, 1807, formally executed and delivered. This grant included the premises in question. Subsequently and on the 4th day of April, 1809, William Rhinelander, Jr., died, and there is no evidence that he republished his last will and testament after the execution and delivery of the aforesaid grant. Thereafter his will was duly proved and admitted as a will of real and personal estate, and his uncle Philip Rhinelander, as the devisee thereunder, entered upon and took possession of the premises included in the grant by the city. Thereafter and on the 14th day of July, 1817, Philip Rhinelander made and published his last will and testament whereby after making certain specific legacies and devises not affecting the premises in question, he devised and bequeathed to his brother

William Rhinelander the whole residue and remainder of his property and estate, real and personal, and in terms included in the devise and bequest the estate formerly devised to him by his nephew William Rhinelander, Jr. Thereafter and in the year 1822, he died without leaving issue him surviving. Thereupon William Rhinelander entered into possession of the lands in question. On the 30th day of March, 1825, he made and published his last will and testament whereby after making certain specific devises and bequests not affecting the premises mentioned, he devised all the rest and residue of his real estate to his executors in trust during the lives of his children and the longest liver of them, and at the termination of the trust, he devised the residuary to his grandchildren and the issue of deceased grandchildren in equal shares *per stirpes.* He died on the 9th day of September, 1825, leaving seven children him surviving, of whom Eliza, the wife of H. G. Stevens, and the mother of the defendant Mary L. Gallatin, was one. Of such children, William C. Rhinelander was the longest liver, and upon his death, June 20, 1878, the estate was partitioned among the grandchildren, and the lands in question in such partition action were set off to the defendant Gallatin as her share and portion of her grandfather's estate.

It further appears that Mrs. Paulding died June 1, 1852, and her husband William Paulding died February 17, 1854; that they left two sons them surviving, Frederick W. Paulding and Philip R. Paulding; that Frederick W. Paulding died March 17, 1859, leaving him surviving his daughter, the plaintiff Julia Rhinelander Dodge; that Philip R. Paulding died August 20, 1864, leaving him surviving Grace, his only child and heir at law, who is now the wife of Louis P. Grant; that he also left a last will and testament in which all of his estate was devised to his executors in trust during the life-time of such daughter, and the plaintiff Greenfield is now the sole trustee thereof.

Under the statute of 32 Henry VIII, chapter 1, it was provided that all and every person and persons having manors,

lands, tenements or herditaments holden of the king or of any other person or persons, and not holden of the king by knight's service, and so forth, shall have full and free liberty, power and authority to give, will, dispose and devise as well by his last will or testament in writing or otherwise by any act or acts lawfully executed in his life all his said manors, lands, tenements or hereditaments or any of them at his free will and pleasure.

Under this statute it was held that a person could only devise such lands as he was seized and possessed of at the time of the making and publishing of his will. (*Jackson* v. *Holloway*, 7 Johns. 394; *Jackson* v. *Potter*, 9 id. 312; *Lynes* v. *Townsend*, 33 N. Y. 558–563.)

This was the recognized law of our state until the revision of 1830, when it was provided that: "Every will that shall be made by a testator in express terms of all his real estate, or in any other terms denoting his intent to devise all his real property, shall be construed to pass all the real estate, which he was entitled to devise, at the time of his death." (2 R. S. 57, § 5.)

William Rhinelander, Jr., having made and published his will on the 3d day of February, 1807, nine months before he obtained title to the lands in question by grant from the city, the land would not under the law, as it then stood, have passed to his uncle Philip, the devisee, but would have descended to his sister, Mrs. Paulding, his only heir at law.

It is claimed, however, that he was in possession and was the equitable owner at the time his will was made, and that it in express terms devised to his uncle Philip all the real estate of which he was seized and possessed at the time of making his will, as well as all of which he may be seized or possessed at the time of his death. If he was in possession under a contract to purchase or under equities which the courts would enforce, such rights and equities would pass under a devise subsequently made. (*Livingston* v. *Newkirk*, 3 Johnson's Chr. 312; *M'Kinnon* v. *Thompson*, Id. 307; *Malin* v. *Malin*, 1 Wendell, 625.)

The question, therefore, is as to whether William Rhinelander, Jr., at the time of making his will was in possession of the lands in question, and had he such an equitable interest therein as would pass to his uncle under his will.

There appears to be no question but that the city was the owner of the lands. For under the Governor Dongan and Governor Montgomerie charters the lands under water surrounding Manhattan island were granted to the mayor, aldermen and commonalty of the city of New York for the distance of four hundred feet. That the city had adopted the policy of conveying the lands so under water to the abutting upland proprietors, appears from the reports made to the board of aldermen, and the ordinances adopted by it fixing terms, conditions and charges which should be made therefor. It is said that the city was under no obligation to make grants to the upland owners; that it had the right to grant the lands so under water to any other persons. Possibly this right may have existed, but we do not deem it important at this time to determine the question, for it is sufficient to say that it does not appear that there was any attempt on the part of the city or its officers to make conveyance of such lands to any other persons than the upland owners.

Formerly the abutting uplands in question belonged to Trinity church, and was known as the church farm. On the 6th day of March, 1797, the church conveyed to Frederick Rhinelander lots numbered 806, 807, 808, 809 and 810 on the west side of Greenwich street, bounded on the north by Beach street and the west by high-water mark of the Hudson river. It is said that under a map produced from the files of the church made by surveyor Charles Loss, in the year 1799, two years after the execution and delivery of the deed to Frederick Rhinelander, the lots conveyed did not extend to high-water mark, and so it would seem to appear from the map, as the line indicated thereon as the high-water mark does not quite reach the lots marked with the numbers mentioned in the deed. But there can be no question but that the deed must control. By it the lands conveyed were bounded on the west

by the high-water mark of the river, a boundary line well known and understood, and about which there could be no question. This map is not the one referred to in the deed, but was subsequently made for the purpose of showing the unsold lands belonging to the church.

It appears that previous to this conveyance, and in the year 1794, the board of aldermen had passed a resolution to grant to the Episcopal church the water lots north of Read street agreeable to such survey thereof as shall be approved by the board. Subsequently and on the 10th day of May, 1797, Frederick Rhinelander, who, under his conveyance, had become an upland owner abutting on a portion of such water lots, petitioned the board of aldermen to make him a grant of the soil under water in order that he might build a bulkhead and fill the same in. Thereafter and on the 29th day of May, 1797, the street committee to whom the petition had been referred, reported that, in their opinion, a grant ought to be made to the petitioner out as far as the permanent line, he paying the quit rent established by the corporation, after his paying as a consideration for the ground between high and low-water mark, four hundred pounds. This report was agreed to by the board. But it does not appear that any conveyance was executed or money paid, but on the 26th of March, 1799, the common council ordered the recorder to inquire into the state of the water lots which were intended to be granted to Trinity church and improved by Frederick Rhinelander. On the fifteenth of July thereafter a further resolution was passed directing the recorder to proceed against Mr. Rhinelander by ejectment or otherwise for any intrusion on the rights of the corporation to the soil in the Hudson river. It is thus apparent that Rhinelander had in some way taken possession of the land embraced in the report, and this is made apparent from a further report that was made by the comptroller of the city in 1803, in which he states that on the North river grants have been made from the Battery to Chambers street; that from Chambers street northward there had been no grants made, but the proprietors of the ground had

most of them docked out agreeable to their own discretion, and some of them beyond the permanent line; that they had been in possession and had had the use of the property for years without any compensation being made to the public. Here the matter appears to have rested until June, 1807. Frederick having died in 1805, his son, William Rhinelander, Jr., petitioned the mayor, aldermen, etc., for a grant of the lands so under water, and in his petition he refers to the petition of his father and of the action of the board thereon ordering the grant to be made. Upon the presentation of such petition it was referred to the comptroller, who was directed to make a report thereon, and in August thereafter the comptroller made a report to the common council, reciting all of the facts and recommending that grants be ordered to be made out in favor of the petitioner to the permanent line established by the city, and "*present wharves inclusively*," upon such terms as may be just and right according to the usual prices of grants in that quarter of the city. Subsequent reports were made by him and the street committee pertaining to the terms on which the grant should be made, and finally and on the 16th day of November thereafter, the grant was executed and delivered conveying to him the lots in question, describing them as the lands *of which he was at that time in actual possession.*

It further appears that on the 12th day of February, 1798, the corporation of the city presented a petition to the legislature of the state, showing that the city had lately directed a permanent street to be laid out and completed at the extremity of its grants already made and thereafter to be made to individuals on the East river near South street, and on the North or Hudson river near West street, south and west of which no buildings of any description were to be erected, and that by reason of the irregularities of the shore and the grants theretofore made which were deemed to extend unequal distances into the rivers, and that, although the city was willing gratuitously to give the soil under water on which the streets were to be made, yet doubts were entertained whether the city, could

compel any of the proprietors of the lots fronting thereon and who might be unwilling to make the streets for public use in any given reasonable time, and, therefore, prayed the legislature to confer upon the corporation full authority in the premises. Thereupon chapter 80 of the Laws of 1798 was passed, entitled " An act concerning certain streets, wharves and piers, etc., of the city of New York," whereby it was among other things enacted that it should be lawful for the mayor, aldermen and commonalty of the city of New York to lay out the streets mentioned in the petition and that the streets or wharves should be made or completed according to the plan adopted and at the expense of the proprietors of the land adjoining or nearest and opposite to the streets or wharves in proportion to the breadth of their lots, by certain dates to be for that purpose appointed by the mayor, aldermen and commonalty, and that the respective proprietors of such of the lots as may not be adjoining to the said street or wharves should also fill up and level at their own expense according to such·plan and by the dates respectively the space lying between their several lots and the said streets and wharves, and should upon so filling up and levelling the same *be respectively entitled to become the owners of the said intermediate space of ground in fee simple.*

The referee has found as facts that the corporation of the city accepted this act of the legislature and acted upon it accordingly; that Frederick Rhinelander, pursuant to the act, did fill out and level nearly all the space lying between his uplands and West street and was so engaged in filling out and levelling at the time of his death; that such filling was continued by his son, William Rhinelander, Jr., up to the time that the grant was made to him and that the lands so filled up included the premises in question.

It is claimed that these findings are not supported by the evidence, but we are of the opinion that they are sustained. Of course, no living witness could be produced who could speak from personal knowledge. The facts had to be ascertained from the records and ancient papers that had been

preserved. That Frederick was in possession is quite evident from the proceedings of the board of aldermen, to which we have already alluded, the various reports that were made by the comptroller and street committee, and the admissions in the grant. That the filling had also been done appears from the report in 1803 and the maps that were made in 1807.

It is true that there is no evidence showing that the city ever adopted a plan after the passage of the act of 1798, or that any dates or times were specified within which Frederick Rhinelander should do the filling. It does, however, appear from the maps that West street was laid out and that a permanent line was established beyond which no grants would be made. The provision of the statute providing for the fixing of a time within which the work was to be performed was for the purpose of enabling the city to enforce performance by causing the work to be done and charging the expense thereof upon the owner of the abutting land. This, however, could not be done until such owner had been given a reasonable opportunity to do the work himself. If, therefore, the owner was proceeding with reasonable despatch to perform under the act there would be no necessity for the city to give him notice to perform within a specific date or time, and inasmuch as no notice of that character is shown, we must assume that he performed under the act to the satisfaction of the officers of the municipality.

We thus have the provision of the act providing that he shall be entitled to become the owner of the spaces of ground in fee simple, and the resolution of the board of aldermen adopting the report of the street committee ordering a grant to be made upon the payment of the quit rent, etc., together. with the fact that possession was taken and the lots filled up as indicated.

These facts would seem to indicate an equitable title, such as would pass by devise.

Undoubtedly there were some questions of difference as to rent reserved and the terms upon which the grant should be made, but these were matters which could easily have been

determined by the court under the provisions of the act or the proceedings of the council.

A controversy as to the amount due upon a contract for the purchase of real estate would not prevent its passing by devise, subject of course to the payment of the amount that should be found due and owing. (*Livingston* v. *Newkirk, supra.*)

The defendant has alleged as a defense the Statute of Limitations and adverse possession. It appears that the possession of the premises in question after William Rhinelander, Jr., was in William Rhinelander as early as December, 1822, and March, 1823; that the premises were at such dates leased by him to James Wallace; that after his death his executors took possession thereof and leased the same from time to time until the death of William C. Rhinelander in 1878, and that thereafter they were taken in charge by the receiver appointed in the partition action, and so held until they were set apart to the defendant herein.

It does not appear at what period the premises were first built upon, but it does appear that in 1848 the building now standing thereon covering the same was constructed, and that it took the place of an older building which previously existed thereon. During all the time that the premises were in the possession of the executor under the will of William Rhinelander, the rents were collected with that of the other real estate held by him and the same divided among his children as provided for in the will.

It is claimed, however, that William Rhinelander was the trustee of Mrs. Paulding, and that because of such trusteeship the statute would not run as against her. If it was a fact that he was her trustee as to the real estate in question, his possession thereof would, in the absence of any act or claim inconsistent therewith, be deemed to be that of his *cestui que trust*, and if he held the same as her trustee, his title would not have passed under his will to his executors, and if William C. Rhinelander subsequently took possession and held the same adversely, any rights gained by such adverse holding would have descended to his heirs or passed to his

devisees, and would not have passed to the defendant under the will of her grandfather. But we do not understand that the referee has found or has been requested to find that William Rhinelander was the trustee of Mrs. Paulding so far as this real estate was concerned. It does appear that prior to the marriage of William Paulding with Maria Rhinelander, a contract of marriage was entered into between them wherein William Rhinelander, Phillip Rhinelander and Cadwallader D. Colden were constituted trustees with power to put certain moneys at interest and take securities therefor in their names as trustees for her benefit, etc. It also appears from the testimony of the plaintiff, Mrs. Dodge, that on one occasion on examining the contents of an old trunk filled with papers, which she received from her father upon his death, that she discovered a paper entitled " William Rhinelander, trustee for the estate of Maria Rhinelander, wife of William Paulding, in account," which paper contained a list of houses and lots, some of which were on West street, but that this paper was subsequently burned by her direction. She did not testify, neither is it found as a fact, that the property in controversy was mentioned in that paper. Whilst there was a trust pertaining to the moneys that she had before her marriage, there is no evidence or finding from which we can determine that it continued to the real estate in question.

We cannot, therefore, overrule the findings of the referee, but must regard the possession of William Rhinelander as adverse to that of Mrs. Paulding. Mrs. Paulding was at the time of the death of William Rhinelander under the disability of coverture. She however died in 1852, and her husband died in 1854.

Chapter 183 of the Laws of 1801, provided that " No action for the recovery of any lands, tenements or hereditaments shall hereafter be maintained, nor any avowry or cognizance be made unless on a seizin or possession of the hereditaments, either of the plaintiff or person making avowry or cognizance, or of the ancestor or predecessor of such plaintiff or person making avowry or cognizance within twenty-five

years next before such action brought, or avowry or cognizance made; provided always that no part of the time during which the plaintiff or person making avowry or cognizance shall have been within the age of twenty-one years, insane, *femme covert*, or imprisoned, shall be taken as a part of said limitation of twenty-five years."

The Revised Statutes of 1830 continued in substance the provisions of the statute of 1801 with the exception that it reduced the period from twenty-five to twenty years and in reference to the persons disabled by reason of infancy, insanity, coverture or imprisonment, it provided that: "Such person may bring such action or make such entry, avowry or cognizance after the said time so limited and within ten years after such disability removed, but not after that period. If the person entitled to commence such action or make such entry, avowry or cognizance shall die during the continuance of any disability specified in the preceding section and no determination or judgment be had of the title, right or action to him accrued, his heirs may commence such action or make such entry, avowry or cognizance after the time in this article limited for that purpose and within ten years after the death, but not after that period." (2 R. S. 295, §§ 16, 17.)

The same was continued by the Code of Procedure of 1848. The disability of married women under the statute was removed by the Laws of 1870 (Chap. 741).

Mrs. Paulding left two sons, both of full age. They should have brought the action within ten years after the death of their father who would have had a life estate as tenant by curtesy. The action should, therefore, have been brought prior to February 17, 1864. (*Jackson* v. *Johnson*, 5 Cowen, 74; *Thorp* v. *Raymond*, 16 Howard [U. S.] 247–250; *Fleming* v. *Griswold*, 3 Hill, 85; *Carpenter* v. *Schermerhorn*, 2 Barb. Chr. 314; Tyler on Ejectment and Adverse Enjoyment, 932.)

Exceptions were taken to the admission in evidence of the petitions of Frederick Rhinelander and William Rhinelander, Jr., to the board of aldermen for the grant of these lands and also to the reception of the old maps and leases.

It appears that upon the death of William Rhinelander in 1825, he left a large landed estate in the city of New York, which for upwards of fifty years was under the chief management and control of his son and executor, William C. Rhinelander, that during this period William C. had an office as executor in which there was a large safe, and that there was kept therein the deeds, maps, papers, books, etc., pertaining to the estate ; that there were a large number of old deeds, books, leases and muniments of title. It was among these papers that the petitions, maps and leases were found. They were identified by persons connected with the office, who in that way had become familiar with the old papers and writings of the petitioners. The fact that petitions by these parties were actually made to the board of aldermen at the dates therein indicated appears from the record of the proceedings of such board. A careful examination failed to find the petitions on file among such proceedings. Under the circumstances we think these petitions were properly received in evidence as ancient writings, and as being the best evidence obtainable of the contents of the petitions presented to the board of aldermen ; and the same may be said of the ancient maps and leases which were material as tending to show possession.

In 1 Phillips on Evidence (at page 281), it is said that ancient documents "are often the only obtainable evidence of ancient acts of possession which may be of great weight in the investigation of titles, and they naturally accompany and constitute a part of such acts."

In 1 Greenleaf on Evidence (§ 142) it is said : "The value of these documents depends mainly on their having been contemporaneous at least with the act of transfer, if not part of it. Care is first taken to ascertain their genuineness, and this may be shown *prima facie* by proof that the document came from the proper custody or by otherwise accounting for it. The documents found in a place in which and under the care of persons with whom such papers might naturally and reasonably be expected to be found, or in possession of persons having an interest in them, are in pre-

cisely the custody which gives authenticity to documents found within it."

In the case of *Hewlett* v. *Cock* (7 Wendell, 371), it was held that " a lease more than thirty years old may be read in evidence without proof of its execution, although there be no direct proof of possession accompanying it, if found among the title papers of the estate affected by it, and the facts and ciicumstances in reference to the property specified in it be such as to afford a reasonable ground of presumption of its genuineness." (See also *Jackson* v. *Laroway*, 3 Johnson's Cas. 283 ; *Enders* v. *Sternbergh*, 2 Abb. Ct. App. Dec. 31.)

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.